## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALLISON MARIANO CYR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-11930-JEK |
| | ) | |
| BOSTON MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE

**KOBICK, J.**

Plaintiff Allison M. Cyr worked as a Staff Nurse in the Neonatal Intensive Care Unit ("NICU") of defendant Boston Medical Center ("BMC") until the fall of 2021, when she lost her job for refusing on religious grounds to be vaccinated against COVID-19, as required by BMC's immunization policy. Cyr alleges that she was wrongfully terminated on the basis of her religion, in violation of Title VII, 42 U.S.C. § 2000e-2(a), and chapter 151B of the Massachusetts General Laws. Pending before the Court are BMC's motion for summary judgment and Cyr's motion to strike certain paragraphs of a declaration submitted by BMC that reference the COVID-19-related recommendations of the Centers for Disease Control and Prevention ("CDC"). BMC's motion for summary judgment will be granted because the undisputed evidence establishes that accommodating Cyr's vaccine exemption request would have imposed an undue hardship on BMC. Cyr's motion to strike will be denied because the statements she characterizes as inadmissible hearsay are not being offered to prove the truth of the matter asserted.

**BACKGROUND**

The following facts are either undisputed or recounted in the light most favorable to Cyr, the non-moving party, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

BMC is a safety-net hospital located in Boston's South End. ECF 35, ¶ 2. From August 7, 2017 to October 15, 2021, Cyr worked as a Staff Nurse in BMC's NICU. *Id.* ¶¶ 1, 3. The NICU's patients include babies who are born premature, suffer from gestational diabetes, or have difficulty feeding. *Id.* ¶ 4. These patients are placed in private rooms or rooms with up to four beds. *Id.* ¶ 6. Cyr cared for three to four patients each day, and she was responsible for, among other things, checking babies' vital signs, changing diapers, bottle feeding, conducting blood draws, and administering medications. *Id.* ¶¶ 5-6. Cyr interacted with NICU doctors and nurses throughout her shift. *Id.* ¶ 7.

Throughout the COVID-19 public health emergency, BMC provided front-line care to Boston's most vulnerable populations. *Id.* ¶ 8. Between January 31, 2020 and July 31, 2021, BMC treated over 3,200 patients for COVID-19, 226 of whom died from the virus or related complications. *Id.* ¶ 9. Several hundred BMC staff members contracted COVID-19 during this period. *See id.* When COVID-19 infection rates surged, BMC was forced to close or convert several units to care for the influx of patients who were seriously ill with COVID-19. *Id.* ¶ 8.

BMC began offering the COVID-19 vaccine to its staff soon after it became available to healthcare workers in January 2021. *Id.* ¶ 10. Based on its own experience during the pandemic and the CDC's recommendations, BMC knew that healthcare workers had an elevated risk of infecting their patients, including their medically vulnerable patients, and that healthcare workers themselves faced an elevated risk of infection, due to transmission from their patients and from

other healthcare staff. ECF 34-2, ¶¶ 12-13. Accordingly, in July 2021, BMC informed all employees via email that they would be required to be vaccinated against COVID-19. ECF 35, ¶ 11; ECF 34-2, at 7-8. BMC implemented an "Immunization Policy" that codified this requirement the following month. *See* ECF 35, ¶ 12; ECF 34-2, at 10-12. Based on its experience and the CDC's recommendations, BMC determined that mandating vaccination was the best way to prevent the spread of COVID-19 among healthcare staff and between healthcare workers and patients. *See* ECF 35, ¶¶ 13-14. The hospital concluded that any increased risk of COVID-19 transmission would adversely affect staffing, negatively impact its reputation of providing safe care for patients, and increase its exposure to legal liability. *See* ECF 34-2, ¶¶ 24-25; ECF 35, ¶ 42. BMC considered alternatives to vaccination—including masking, periodic testing, and social distancing—but determined that these measures would be less effective than the vaccine at reducing transmission. *See* ECF 34-2, ¶ 23. For example, based on its experience throughout the first year of the pandemic, BMC found that social distancing was not always practicable for staff and patients, and that periodic testing would not adequately reduce transmission due to the risk that infected staff members would not be identified on days they were not tested. *See id.*

On September 12, 2021, Cyr, who is Christian, submitted a request for a religious exemption from the COVID-19 vaccination requirement. ECF 35, ¶¶ 16-17; ECF 34-1, at 21-31. In support of her request, she submitted a personal statement and a letter drafted by Pastor David Hall, who heads the California-based True Hope Ministry. *See* ECF 34-1, at 21-31. In his letter, Hall stated that he was writing to affirm Cyr's view that "[t]aking a covid test or vaccine, or wearing any sort of face covering or shield, is an affront to a Christian believer's sincerely held religious beliefs." *Id.* at 25, 28. As to vaccines, he elaborated:

> [A]s believers, we know that the body is the temple of the Holy Spirit. God has
> created us with an immune system and we object to the intrusion of any medical

intervention designed to modify God's design of the immune system. Further, the substances in the vaccine are possibly harmful to the human body, and we are called to protect the body and not participate in an unnecessary medical intervention, especially one that is incurred under coercion or duress. We are called to honor the LORD in all we do.

*Id.* at 28. Cyr expressed similar religious objections in her personal statement, as well as more general concerns regarding the vaccine's safety, effectiveness, and possible impact on fertility. *See id.* at 30-31.

BMC denied Cyr's exemption request in a letter dated September 30, 2021. ECF 35, ¶ 38; ECF 34-1, at 84. The letter stated that BMC had considered three questions when reviewing Cyr's request: (1) whether Cyr's belief was religious; (2) whether her belief was sincerely held; and (3) whether "providing a reasonable accommodation (i.e., to remain unvaccinated in [Cyr's] position) [would] impose an undue hardship on the hospital." ECF 34-1, at 84. The letter continued: "After a careful review of your request, the hospital has determined that you do not qualify for an exemption from the vaccine requirement and the hospital cannot accommodate your request." *Id.* BMC did not explain its reasons for reaching this conclusion in the letter. *See id.* In a declaration, BMC's Executive Director of Employee and Labor Relations, John M. Hickey, avers that the hospital denied Cyr's request because providing a NICU nurse "with a religious exemption to the [Immunization] Policy would pose an undue hardship on the hospital." ECF 34-2, ¶ 20; *see* ECF 35, ¶ 39. The letter informed Cyr that she would be required to comply with the Immunization Policy and was expected to have received at least one shot by October 15, 2021. *See* ECF 34-1, at 84. Cyr did not receive any COVID-19 vaccine by October 15. *See* ECF 35, ¶ 40; ECF 34-1, at 86. Accordingly, that day, BMC terminated Cyr's employment for failure to comply with its Immunization Policy. ECF 35, ¶ 40; ECF 34-1, at 86.

4

BMC received 138 religious exemption requests, including Cyr's, between August and November 2021. ECF 34-2, ¶ 21. It denied each of those requests "because it determined that permitting an employee to work unvaccinated posed an undue hardship on its business by increasing the risk of COVID-19 transmission amongst staff and between staff and patients." *Id.* ¶ 22. Between August 1, 2021 and January 31, 2022, BMC treated nearly 1,000 patients with COVID-19. *See id.* ¶ 26. It continues to treat patients experiencing severe COVID-19 symptoms and complications today. *Id.* ¶ 27.

Cyr filed her two-count complaint in November 2022. ECF 1. After the parties completed discovery in July 2024, BMC moved for summary judgment, ECF 33, and Cyr moved to strike certain paragraphs of the Hickey Declaration, ECF 39, which BMC submits in support of its summary judgment motion, ECF 34-2. The Court took the motions under advisement following a hearing on January 10, 2025. ECF 47.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in

the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## DISCUSSION

### I.    Cyr's Motion to Strike.[1]

Cyr moves to strike paragraphs 11-13, 15, and 23[2] from the Declaration of John Hickey, the Executive Director of Employee and Labor Relations at BMC, on the basis that these paragraphs contain inadmissible hearsay. ECF 39, at 1-2. In each of these paragraphs, Hickey avers that BMC implemented certain COVID-19-related precautions or procedures based in part or in whole on the "recommendations of the CDC." *See* ECF 34-2, ¶¶ 11-13, 15, 23. Cyr confirmed at the hearing on this motion that she moves to strike these paragraphs only to the extent that the assertions made therein are based on the CDC's recommendations. She agreed, for instance, that the assertions in paragraphs 12, 13, and 23 regarding healthcare workers' heightened risk of contracting and transmitting COVID-19, and the efficacy of various alternatives to vaccination, are admissible insofar as they are based on BMC's own experiences. *See* ECF 34-2, ¶¶ 12, 13, 23. Cyr also acknowledged that the First Circuit's decision in *Does 1-6 v. Mills*—which stated that

---

[1] BMC asks the Court to deny Cyr's motion to strike due to her counsel's failure to comply with Local Rule 7.1(a)(2)'s requirement that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." L.R. 7.1(a)(2); *see* ECF 43, at 1 n.1. It is not necessary to decide BMC's request because, as explained in this Order, Cyr's motion to strike will be denied on the merits.

[2] Cyr states in her motion that she is moving to strike paragraph 22 of the Hickey Declaration, which does not reference the CDC's recommendations. *See* ECF 39, at 1. At the hearing on this motion, Cyr's counsel confirmed that she is in fact moving to strike paragraph 23, which does reference the CDC's recommendations.

"[t]he COVID-19 vaccines protect against infection," lower the risk of serious illness in case of infection, and "reduc[e] a person's risk of transmitting COVID-19 to others"—is binding on this Court. 16 F.4th 20, 32-33 (1st Cir. 2021). BMC argues that the CDC's recommendations do not constitute hearsay because they are not offered for the purpose of proving the truth of those recommendations, "but rather to provide context and reasons for BMC's decisions and actions." ECF 43, at 3 (citing Fed. R. Evid. 801(c)(2)).

Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Unless an exception applies, hearsay evidence is inadmissible, Fed. R. Evid. 802, and "cannot be considered on summary judgment," *Dávila v. Corporacion de Puerto Rico para la Difusion Publica*, 498 F.3d 9, 17 (1st Cir. 2007). However, "[o]ut of court statements offered not for their truth but 'offered only for context,' do not constitute hearsay." *United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001) (quoting *United States v. Catano*, 65 F.3d 219, 224 (1st Cir. 1995)).

BMC avers that it "does not seek to introduce statements made by the CDC, or to prove the truth of the recommendations made by the CDC." ECF 43, at 4. Instead, BMC states that it references the CDC's recommendations to illustrate the information that it considered when developing its vaccination policy. *See id.* An out-of-court statement offered only "to show that the declarant had certain information, or entertained a specific belief, or . . . to show the effect of the words spoken on the listener (e.g., to supply a motive for the listener's action)" is not a statement

offered for the truth of the matter asserted. *United States v. Murphy*, 193 F.3d 1, 5 n.2 (1st Cir. 1999). Insofar as the CDC's COVID-19-related recommendations are offered for the purpose of explaining that BMC implemented its Immunization Policy based on the recommendations of an expert federal agency, Cyr's motion to strike will be denied because the recommendations are not hearsay in that context. *See Harmon v. Boston Med. Ctr.*, No. 22-cv-11856-MJJ, 2024 WL 4815292, at *4 (D. Mass. Nov. 18, 2024) (denying a nearly identical motion to strike on the same grounds), *appeal docketed*, No. 24-2073 (1st Cir. Nov. 25, 2024); *Melino v. Boston Med. Ctr.*, No. 22-cv-12119-RGS, 2024 WL 2724145, at *1 n.2 (D. Mass. May 28, 2024) (denying a motion to strike in a similar religious discrimination case brought against BMC for the plaintiff's failure to comply with Local Rule 7.1, but noting that the CDC's "recommendations, and the medical and statistical information upon which they rest, are subject to judicial notice"), No. 24-1527 (1st Cir. argued Dec. 4, 2024).

## II.    **Boston Medical Center's Motion for Summary Judgment.**

Cyr asserts that BMC's failure to accommodate her sincerely held religious beliefs, and its subsequent termination of her employment, amounted to religious discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a), and M.G.L. c. 151B, § 4(1A). Both statutes prohibit employers from discriminating on the basis of religion. *See* 42 U.S.C. § 2000e-2(a); M.G.L. c. 151B, § 4(1A). To make out a claim of religious discrimination under the statutes,[3] Cyr "must first show 'that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action.'" *Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir.

---

[3] Religious discrimination claims under Title VII and Chapter 151B are generally analyzed under the same framework. *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 131-32 (1st Cir. 2004); *Brown v. F.L. Roberts & Co., Inc.*, 452 Mass. 674, 676-77 (2008). Because Cyr points to no difference between the statutes that affects the analysis in this case, the Court analyzes both claims under the Title VII framework.

2024) (quoting *Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023)). If Cyr makes that showing, the burden shifts to BMC "to show that it 'offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship.'" *Id.* (quoting *Lowe*, 68 F.4th at 719); *see also id.* at 17 (noting that undue hardship is an affirmative defense).

BMC contends that it is entitled to summary judgment because Cyr's opposition to the vaccine was not based on a sincerely held religious belief, and, regardless, because exempting Cyr from its vaccination requirement would have amounted to an undue hardship. ECF 34, at 1-2; ECF 44, at 1. As to BMC's first argument, the First Circuit has cautioned that credibility determinations regarding the sincerity of an employee's religious beliefs are "quintessential fact questions" that "ordinarily should be reserved 'for the factfinder at trial, not for the court at summary judgment.'" *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados*, 279 F.3d 49, 55-56 (1st Cir. 2002) (quoting *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999)); *see also Rodrique v. Hearst Commc'ns, Inc.*, No. 24-1289, 2025 WL 227489, at *4 (1st Cir. Jan. 17, 2025) ("Determining whether a belief is religious is 'a difficult and delicate task.'" (quoting *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 132 (1st Cir. 2004))). Assuming, without deciding, that Cyr refused to receive the COVID-19 vaccine based on a sincerely held religious belief, BMC is nevertheless entitled to summary judgment on its undue hardship defense. *See Melino*, 2024 WL 2724145, at *1 (declining to decide whether the plaintiff stated a prima facie claim for religious discrimination and granting BMC's motion for summary judgment on undue hardship grounds); *Harmon*, 2024 WL 4815292, at *4 (same).

"The undue hardship defense is built into the statutory definition of 'religion,' such that an employment action cannot constitute discrimination on the basis of religion, and an employer cannot be liable under Title VII for religious discrimination, if the undue hardship defense

applies." *Bazinet*, 113 F.4th at 17-18 (citation and quotation marks omitted). Until recently, the First Circuit, like several other federal circuits, held "that an employer established an undue hardship by showing that an accommodation would pose 'more than a *de minimis* cost.'" *Id.* at 18 (quoting *Cloutier*, 390 F.3d at 134). In 2023, the Supreme Court clarified that employers raising an undue hardship defense must satisfy a more rigorous standard. *See Groff v. DeJoy*, 600 U.S. 447, 468 (2023). To prevail on an undue burden defense, an employer now "must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470; *accord Rodrique*, 2025 WL 227489, at *4.

*Groff* emphasized that the undue hardship standard is fact- and context-specific. 600 U.S. at 468, 473. It "requires courts to take 'into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer.'" *Bazinet*, 113 F.4th at 18 (quoting *Groff*, 600 U.S. at 470-71). Both economic and non-economic costs are relevant to the substantial hardship analysis. *See, e.g.*, *MacDonald v. Oregon Health & Sci. Univ.*, 22-cv-01942-IM, 2024 WL 3316199, at *6 (D. Or. July 5, 2024) ("Following *Groff*, district courts have continued to consider both economic and non-economic costs when conducting the undue hardship analysis."). Relevant non-economic costs include health and safety risks, as well as the risk of reputational injury. *See, e.g.*, *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435 (D. Mass. 2021) ("Considerations include not only direct economic costs, but indirect ones related to health and safety." (citing U.S. Equal Emp. Opportunity Comm'n, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, § L (2021)))[4], *aff'd*, 32 F.4th 82 (1st Cir. 2022);

---

[4] The Equal Employment Opportunity Commission's ("EEOC") pre- and post-*Groff* guidance is instructive. *See Groff*, 600 U.S. at 471 ("We have no reservations in saying that a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our

*Cloutier*, 390 F.3d at 134-37 (finding undue hardship under pre-*Groff* standard where Costco employee's requested accommodation—to wear facial piercings at work—posed risk of reputational injury).

The question before the Court is therefore whether a reasonable jury could find, based on the undisputed material facts, that BMC, with the information available to it at the time, could have reasonably accommodated Cyr's request to be exempted from its Immunization Policy without suffering "substantial increased costs" in relation to its provision of healthcare services. *Groff*, 600 U.S. at 470; *see Rodrique*, 2025 WL 227489, at *4 ("[T]o succeed on summary judgment and avoid Title VII liability, [the employer] must show that there was no genuine dispute of material fact that granting [the plaintiff's] exemption request would have imposed an undue hardship on its business."). As discussed, BMC provided front-line healthcare to Massachusetts residents throughout the COVID-19 public health emergency. *See* ECF 35, ¶ 8. Before implementing the Immunization Policy, BMC treated over 3,000 patients for COVID-19, over 200 of whom died from the virus or related complications. *Id.* ¶ 9. Several hundred BMC staff members contracted COVID-19 during this period. *Id.* When infections surged, the hospital was forced to close certain units or convert them to care for patients who were critically ill with COVID-19. *Id.* ¶ 8. Based on these experiences, as well as the CDC's recommendations, BMC determined that any increased risk of COVID-19 transmission would impede its ability to maintain adequate staffing, negatively impact its reputation of providing safe healthcare to patients, and increase its exposure to liability

---

clarifying decision today. After all, as a public advocate for employee rights, much of the EEOC's guidance has focused on what should be accommodated."). Based on the standard announced in *Groff*, the EEOC now advises that "[a]n accommodation may cause undue hardship if it is costly, compromises workplace safety, decreases workplace efficiency, infringes on the rights of other employees, or requires other employees to unwillingly do more than their share of potentially hazardous or burdensome work." U.S. Equal Emp. Opportunity Comm'n, *Religious Discrimination*, https://www.eeoc.gov/religious-discrimination (last visited Jan. 21, 2025).

related to the risk of staff-to-patient COVID-19 transmission. *See* ECF 34-2, ¶¶ 23-25; ECF 35, ¶ 42; *cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest."). Based on the same considerations, BMC concluded that mandating vaccination would reduce transmission of COVID-19, and that alternatives to vaccination—including social distancing, masking, and periodic testing—would be insufficient. *See* ECF 34-2, ¶¶ 23-25; ECF 35, ¶ 42; *cf. Mills*, 16 F.4th at 32-33 ("The COVID-19 vaccines protect against infection and lower the risk of adverse health consequences, including death, should a vaccinated person become infected. Vaccination also reduces a person's risk of transmitting COVID-19 to others.").

Based on these undisputed facts, BMC has demonstrated that permitting Cyr to continue working while unvaccinated would have resulted "in substantial increased costs" in relation to its business as a healthcare provider. As a NICU nurse, Cyr provided direct care to newborn babies, many of whom were in critical condition. ECF 35, ¶¶ 3-4; *see* ECF 34-1, at 5 (Cyr testifying at her deposition: "I took care of sick premature babies, or just sick babies in general"). Cyr worked in-person, and she interacted with babies and other healthcare workers throughout her shift. *See* ECF 35, ¶¶ 3-7. Had Cyr been permitted to continue working while unvaccinated, BMC would have faced the increased risk of her contracting COVID-19 and transmitting it to BMC's patients and staff members, thereby jeopardizing their safety. *See* ECF 35, ¶ 13; ECF 34-2, ¶¶ 12-13; *Groff*, 600 U.S. at 475 (Sotomayor, J., concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees." (alteration in original)). Permitting Cyr to work unvaccinated would have also increased the risk of staffing shortages, which would have harmed BMC's ability to provide critical medical care to its patients.

*See* ECF 34-2, ¶¶ 7-8, 24; *Hall v. Sheppard Pratt Health Sys., Inc.*, No. 22-cv-3261-ABA, 2024 WL 4264898, at *10 (D. Md. Sept. 20, 2024) ("Infection among patients or staff risked . . . disruptions in treatment and an inferior quality of care."), *appeal docketed* No. 24-2048 (4th Cir. Oct. 21, 2024). Finally, BMC would have jeopardized its reputation of providing safe care to patients—vulnerable newborn babies, in Cyr's case. *See* ECF 35, ¶ 42; *Cloutier*, 390 F.3d at 137 (finding undue hardship based on risk of damage to employer's public image); *Hall*, 2024 WL 4264898, at *10 ("[T]he appearance that [the employer] was not prioritizing the safety of its patients and staff could have eroded public trust, an essential for any healthcare facility."); *cf. Together Emps.*, 573 F. Supp. 3d at 441 (noting that permitting healthcare workers to "continue to work at [a Boston-based hospital] without being vaccinated would materially increase the risk of spreading the disease and undermine public trust and confidence in the safety of [the hospital's] facilities").

Cyr concedes that "[i]f the vaccines worked, it would not be difficult for [BMC] to establish undue hardship." ECF 38, at 7. Her only argument in opposition to BMC's undue hardship defense is that it "rests entirely on the faulty premise that the products advertised as COVID-19 vaccines protect against infection and transmission of COVID-19, something that the evidence shows to be in dispute." *Id.* The flaw in this argument is that such evidence is not in dispute. The First Circuit explained over three years ago that "COVID-19 vaccines protect against infection," lower the risk of adverse consequences in the case of infection, and "reduc[e] a person's risk of transmitting COVID-19 to others." *Mills*, 16 F.4th at 32-33. And it has made clear that when "the record demonstrates that [an employer] relied on the objective, scientific information available to [it], with particular attention to the views of public health authorities," a court will find that the employer "acted reasonably when it determined that vaccinated employees are less likely to

transmit COVID-19 than unvaccinated employees." *Rodrique*, 2025 WL 227489, at *4 (quotations marks omitted). The record here demonstrates precisely that. *See* ECF 34-2, ¶¶ 12-15, 22-24.

To be sure, the vaccines' efficacy, including the magnitude and duration of their protective effects, may still be the subject of debate and study within the scientific community. But ongoing scientific debate regarding the extent of the vaccines' protective effects does not raise a genuine dispute as to whether the vaccines mitigate the risk of an individual contracting and transmitting COVID-19. *See Howe v. Mass. Dep't of Correction*, No. 22-cv-40119-MRG, 2024 WL 3536830, at *7 (D. Mass. July 25, 2024). In any case, Cyr has not adduced evidence to support her contention that the COVID-19 vaccines are ineffective. *See* ECF 40, at 1; ECF 38, at 7-11; Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed *must* support the assertion by," as relevant here, "citing to particular parts of materials in the record." (emphasis added)). Her only attempt to introduce such evidence comes in her opposition brief, where she quotes an excerpt from an FDA document that she failed to submit to the Court. *See* ECF 38, at 8-9. The excerpt quoted by Cyr does not, however, suggest that COVID-19 vaccines are ineffective at preventing transmission of the virus. *See id.* The quotation comes from a May 10, 2021 letter, in which FDA's Chief Scientist, Denise M. Hinton, wrote that:

> Based on the totality of scientific evidence available to FDA, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19, and that, when used under the conditions described by this authorization, the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine when used to prevent COVID-19 outweigh its known and potential risks.

ECF 38, at 9 (quoting Letter from Denise M. Hinton, Chief Scientist, U.S. Food & Drug Admin. to Pfizer, Inc., at 3 (May 10, 2021)). While it uses somewhat cautious language, this excerpt supports the view that the COVID-19 vaccine may be effective in preventing COVID-19; it does not say or imply that the vaccine is ineffective.

In sum, the undisputed facts show that allowing Cyr to continue working as a NICU nurse while unvaccinated would have jeopardized the health of BMC's staff and patients, and risked damaging BMC's reputation of providing safe medical care. On this record, no reasonable jury could conclude that BMC could have accommodated Cyr's request for an exemption from its Immunization Policy without incurring these significant costs that, taken together, amount to undue hardship.

## CONCLUSION AND ORDER

For the foregoing reasons, Cyr's Motion to Strike, ECF 39, is DENIED, and BMC's motion for summary judgment, ECF 33, is GRANTED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: January 22, 2025